May it please the Court. Thank you, Your Honor. I'm Randolph Barnhouse here from New Mexico on behalf of the Yakima Nation and the King Mountain Tobacco Company, and this argument gives me an opportunity today to fix a gaffe. A few years ago, Judge Graber, in an argument in San Francisco, you were kind enough to point out your connections to New Mexico, and it so surprised me at the time that I don't believe I was as courteous as I should have been in thanking you for that, for your comments. So thank you today, and now my mind can rest at ease. Welcome to Seattle. Just follow us all around the circuit. Your Honor, this is a Yakima Treaty case decided on summary judgment. That's the posture. Summary judgment against the Yakima Nation and the tribal corporation on a state economic regulation, not with understanding the protections of the Yakima Treaty of 1855. We identified three issues in briefing. The first issue I want to talk about is that, is there expressed federal law in this case? The district court held the treaty is not expressed federal law, although over about a hundred years of precedent from this Court and the U.S. Supreme Court says that it is expressed federal law that limits the state of Washington's ability to regulate activity off the reservation. The second issue was whether the district court failed when it made no factual findings regarding the Yakima Treaty and its meaning, both at the time and its meaning to the Yakima people. The kind of factual findings, 90 of which were made in Cree, hundreds of which were made in U.S. v. Washington. The third issue is whether the treaty is limited to trade goods principally generated from reservation land and resources. The state did not address and has conceded this third issue, but we feel the district court erred when it made that holding. The first two issues, as to those first two issues, a host of cases in this Court and the U.S. Supreme Court have confirmed that Washington's regulatory authority is limited by the Yakima Treaty. What specifically in the Yakima Treaty relates to the particular law that we're looking at here? Those would be both Article II of the treaty, which guarantees exclusive use and benefit, and unlike Inc. Areta. But what about this denies them the use and benefit of the land? Nobody else is growing these products. Nobody else is selling these products. Nobody is trampling on their crops. They're using and benefiting from whatever is grown. They are, and they're also manufacturing product on these trust-allotted lands using local labor and local resources, and they can't take those then to market to trade. And in many respects, the Article II... Who says they can't take them to market to trade? I don't understand that to be part of the state at all. I'm sorry. The state of Washington says, unless you comply with our regulations... Which apply to everybody who does this type of business. Well, no other participating manufacturer, non-participating manufacturer has to forego treaty rights to do that, so it's a discriminatory... But that assumes the answer that there is a treaty right that pertains to this. Exactly, Your Honor. But that's where I have difficulty. I don't see that the treaty has anything to do with what's going on here. The treaty talks about a physical location, a geography that is for the exclusive use and benefit of the Yakima Nation, and nobody's interfered with that. They're using it. They're benefiting from it. But in terms of general laws of application to other people doing the same thing, I mean, let's suppose they were manufacturing aspirin, and there were safety regulations that said aspirin have to be of a certain purity. It's a general regulation, and there's nothing about the treaty that has anything to do with it. That's how I see it. Where am I wrong? And that's the way lawyers would read this. And what this Court has said is it's not the words to learned lawyers. It's not the words to even to the U.S. negotiators. It's what those words meant to the Yakima people at the time and now. And the problem here... Or manufacturing cigarettes, then, sending them out to North Carolina and everywhere and so this whole scenario was never imagined in 18-whatever it was. 1855, Your Honor. That's right. But what was imagined is that the Yakima were going to be... They gained an economic benefit here. They gained a competitive advantage through this treaty, not just for what they were doing then. No court has held them to that. Smiskin addresses that exactly. In Smiskin, the cigarettes weren't even made on the reservation. They were brought in from Idaho, and the court held there that the travel and trade provisions of the treaty... That had to do with transportation. This doesn't have anything to do with transportation. So the whole transportation segment of the treaty seems beside the point. I'm only speaking for myself here. But you're not alleging that there's any interference with transportation. You're alleging that the escrow money shouldn't be withheld. No, Your Honor. We are alleging an infringement of transportation because it's the courts  Let's focus on Article 2 first. I think that's what Judge Graber is trying to get you to do. Article 3 is a different matter. So let's keep your argument corralled because I'm having a hard time getting there as well. I read Article 2, it sounds like, the way Judge Graber is. I'm just speaking for myself. I read that article to talk about a geographic description of what was going to be negotiated. Where do you find support in Article 2, please? If you look just at the words on the face of the treaty... For the use and benefit of... Exclusive, exclusive use. Right. So is your argument that because it says for the exclusive use and benefit of the nation, that they shouldn't have to fork over any part of the sales proceeds from what they generate on the land? Is that it? Your Honor, that's what Smithkin held. But I guess my argument is we don't even get there because the district court didn't get there. The district court didn't say, okay, you've got a state regulation and you've got a treaty that's expressed federal law. I, district court, need to make findings of fact along the lines of what you all are... Only if there's an ambiguity. If there's no ambiguity, there's no place for findings. Is your argument that in every case, the district court has to make, has to have an evidentiary hearing and make findings of fact? I believe based on the hundred years of precedent in every Yakima Treaty case, and this is a separate, this isn't any treaty or a treaty. This is the Yakima Treaty. In every Yakima Treaty case, the court would need to look at, the court meets, it meets the first requirement. Is there express law? My question is quite specific. Yes. Do you think he needed to have an, any district court judge would need to have an evidentiary hearing every time there's an issue about the applicability of a state law to activities involving the Yakima Treaty? Every district court would have to make evidentiary findings, Your Honor. I don't know that an evidentiary hearing is necessary. Okay. So that's helpful and I appreciate that. I'm only, I don't mean to cut you off, but your time's ticking and I want to try to help get there. So in this case, what the judge did, he said, I'm paraphrasing, there is no set of facts that would change this legal ruling. So why was that wrong? Because as Judge Graber said in 1855, they weren't manufacturing cigarettes on the, on this reservation. But under this court's precedent, it wouldn't matter what they were doing at that time. And if it had the court looked at the facts, what the facts show is that the negotiators contemplated future, the whole idea here was to help the Yakima Indians through having market advantages that they'd always enjoyed, keep those advantages. Do you disagree with the proposition that a general law of a state can apply to goods and sales of goods that come from the Yakima Nation? No, I do disagree. I do disagree. All right. So in my example about the manufacture of aspirin, there's no requirement to have a certain purity level if they can get an economic advantage by making it cheaper and it doesn't, so that kind of law wouldn't apply either? No, because that kind of law would be purely regulatory. And as the court, again, in Smiskin noted, one, this one isn't purely regulatory, but in Smiskin, those kind of health and safety regulations would apply. And two, the Yakima Nation's not selling marijuana. They're not selling the product here. It's legal in Washington to sell marijuana, too, now. Under federal law. And that's, you know, it's easy to point the finger at a sovereign, but the fact is the Yakima Nation, as noted in Smiskin, is a good neighbor, and they've not engaged in that. But no, if it was purely regulatory, and that's what the court in Tuleaf said. Well, where do you draw the line? This is not a tax. It is a type of, it's somewhere between the pure health and safety and the tax. It's somewhere in that netherworld. So where do you draw the line? If it helps the state raise money, it's not purely regulatory. And nothing about this scheme that the state has set up impacts the content, the nicotine level, any of the thing about that pack of cigarettes. That pack of King Mountain cigarettes is absolutely legal. Other than, but not if they don't comply with the financial requirements, the listing requirements that make the state of Washington billions of dollars. I'd like to reserve five minutes of my time, well, now four, for rebuttal. So let me move quickly to the travel and trade provision of Article 3. Article 2 really benefits from Article 3, and they should be read together. But Article 3, it seems clear under Cree and under Smisken that the district court needed to make factual findings or adopt the Cree factual findings. But it had to get past that first step. In other words, the district court said laws of general, non-discriminatory laws of general applicability can be used to regulate Indians off reservation, absent express federal law. And Wynans, the court... What specifically in Article 3 are you relying on? The language that says that as a result of trading 17,000 square miles of land, the Yakima, the U.S. would have the right to build roads, and the Yakima would have the right to travel those roads along with other citizens. So that's the difficulty I have to, again, to help preserve time on the clock. This case isn't about travel. Your Honor, what Smisken makes clear is it's about bringing your goods to market. They can manufacture cigarettes all day long. So, Counsel, this doesn't seem to prevent them... Well, I've interrupted you, actually. But this doesn't seem to prevent them from bringing goods to market. So can you go to that? They cannot bring their goods to Seattle and sell them unless they get on the state directory. They cannot bring them here and sell them. So they could bring them here and take them home. But otherwise, they have to... So it isn't about transportation. It's about the money. Absolutely. It's not about transportation. It's about money. No, it's about trade. The Yakima are traders. It's money for the... Here we're talking about money for the state and money in our free enterprise system. The Yakima have always been inveterate traders, trading not only their own goods, but goods from all over. And this was recognized. Of the 11 treaties that were... If this argument is correct, how could Washington tax any of their goods, any of their activities off reservation? Impose any true tax? Washington can't impose off reservation on the Yakima. Now, that doesn't mean they can't have gross receipts. They couldn't have taxes on the... What other states have done, what Washington has done quite successfully, is go to the source, go to the customers. Colville is a perfect example of that. The U.S. Supreme Court said, you can't stop the Indians from selling the cigarettes, but you can... But the tax isn't on the Indians. The tax is on the people who buy the Indians' products. And the Indians can... Colville says this. Gregoire says this. The Indians can be required to do minimal, non-intrusive record keeping. But, Counselor, a tax under those circumstances, under Colville, for example, is much more burdensome than what we're talking about here, right? Not at all, Your Honor. There are millions and millions of dollars in escrow. The state makes billions of dollars here. The tax in Colville was at the retail level. This is at the manufacturing level. I'd like to reserve the rest of my time. You may do that. Counselor, am I correct? Oh, do you want to have an opportunity to state your appearance first? Yes, Your Honor. May it please the Court, my name is David Hankins. I'm senior counsel and with me is Josh Weissman, and we represent the Attorney General, Robert Ferguson, in this case. Thank you. Am I correct that this money that goes into escrow is then... I want to know what happens to the interest. My understanding is that it doesn't go to the state of Washington while it's in escrow. Is that right? That's correct, Your Honor. Let me go right into that because that is absolutely incorrect what Counsel says, that this money goes to the state. This money is based on units sold. In order to get a unit sold on a cigarette, it has to have a state cigarette tax stamp on that. Then what a wholesaler reports that to the Department of Revenue, and from that report they deposit money into an escrow account. Who's they? The cigarette manufacturer, so King Mountain. A non-participating... A non-participating manufacturer. That non-participating manufacturer then gets the interest every year from that. Right, and if the money's not spent, as I understand it, either for a refund or because there's been an event, a liability imposed pursuant to some other litigation related to the sale of the product, or the use of the product, I should say, it's refunded, isn't it? It's held for 25 years, Your Honor, and the purpose for holding it for 25 years is so that the states, they continue to incur significant tobacco-related health issues. So what part of this money ever winds up in the state of Washington's coffers? The only way it will end up in the state's coffers is if the state sues King Mountain for the sale of its cigarettes down the road so that we can show that King Mountain cigarettes caused health care-related issues. Right, so it would be liability associated with use of the product, which may or may not ever happen? Yes, that is very possible. All right, thank you. You're welcome. I want to address a couple of items first, if I can, and that is that Washington and 45 other states require cigarette manufacturers to share responsibility for health costs associated with the sale of their products to the public. King Mountain seeks to avoid nondiscriminatory state laws even though its cigarettes are on reservation boundaries to consumers and pose the same health risks as other manufacturers' cigarettes. Nothing in the treaty suggests that cigarettes can be sold coast-to-coast free from any regulation, and this Court should affirm the District Court's judgment for two principal reasons. First, the District Court applied the Mescalero Standard correctly. Absent express federal law to the contrary, King Mountain is subject to Washington's nondiscriminatory laws. No language in either of the articles of the treaty expressly preempts the state statutes regulating cigarette manufacturers. And secondly, I disagree with my opponent that this would be a pure regulatory exception, and that is the second element, because they're required to deposit escrows for the sales of their cigarettes. So let's go specifically to the... And that is, is it the state's position that this escrow deposit would apply only off reservation? That is, if King Mountain sells on reservation to its own... to other Yakima people, does that apply? And the hypothetical you described, Your Honor, no, because we have a mow and call bill, we cannot impose either a fee or a tax on a Yakima member on the reservation. But non-tribal members who purchase on the reservation could be subject to this, yes? Yes, that's what I was going to get to next. The only difficulty I would suggest to you in that particular instance is that King Mountain would have a difficult time in the record keeping, because how would King Mountain know that it was sold? Because as a manufacturer, they may not necessarily know that it was sold from a retailer, a tribal retailer, to a non-member. But based on... Does that cause you problems with the application of the law? No you're not... No, it doesn't. And the reason why, Your Honor, is because most of the sales, where they're going to the state certification and selling to Safeway and 7-Eleven. And that's why at the time this lawsuit was filed, they were certified in 16 other states so that they could sell their product. That's why they could make over $130 million. So it's not that their sales, that we will have that problem on the reservation. We may have to address that, but it's right now, if it's going beyond the reservation boundaries, then those sales have got to be escrowed. So even in Washington, Your Honor, if they sell to any of the other tribes in the state that have a compact with the state of Washington, those cigarettes are also not required to be escrowed, because there's no state cigarette tax stamp on those cigarettes. So they can sell to any tribe in the state of Washington that has a compact, and they don't have to escrow. Why is that important? That gives them an economic advantage. They don't have to escrow for approximately $5.65 per carton. So they're not prejudiced. They're not at any disadvantage as in any other cigarette manufacturer selling off the reservation. Counsel, could I get you to focus on opposing counsel's point about the failure to make findings of fact here? Where do you draw the line in response to the question I asked earlier about at what point does a district court have to make findings of fact, perhaps even have an evidentiary hearing? We did remand in Cree. Yes, you did. And the reason you don't have to go there today is because Cree has already established what Article III definitely means, and this is a question of law. And I would point out to the court that King Mountain moved for summary judgment as well. So they cross-moved for summary judgment, and they told the district court judge, there is no facts that are in dispute. So the district court judge was at the same position saying, well, if there's no facts and general issues of material fact in dispute, then why would I have to issue any findings of fact? Because ultimately, this becomes a question of law. So that's why I don't think you have to have a factual finding or remand this back for a factual finding because this is a pure question of law as to what Article II and Article III mean. And let's talk about Article II. The court has already pointed this out, but I want to follow up with you that you're absolutely right. This language just refers to the physical boundaries of the reservation, the language of the use and occupation and for the exclusive use and benefit. Even if you were to look at it and construe it from the tribe's perspective, that was saying this land is reserved for you, and you can grow what you want to on that. And then to point out to this court, I'm not so sure today that they have the exclusive use. If this court is aware, the Yakima Reservation also has fee land, that it's a checkerboard reservation. So they don't necessarily, if they said that they get that land and they get the exclusive use, that's not true anymore. But it doesn't matter for today's argument, does it? It doesn't, but I want to point out to the court that if King Mountain relies on and we have the exclusive use and benefit, that's not true. And the Congress has already, if you will, amended that or overruled it. And this court in Brindle recognized that as well. I don't understand where this argument would end. That's my problem with it. Your Honor, absolutely. This argument is, counsel's already said to you this morning that there would be no tax, no regular, there would only be health care regulations. Well, let me point out- Isn't it contrary? Isn't Colville directly contrary to this argument? Absolutely, Colville is directly against this, as well as two other United States Supreme Court decisions, Mescalero and Cotton Petroleum. Any time a tribal member goes beyond the reservation boundaries, they are subject to all state non-discriminatory laws. I want to follow up with Judge Graber's point about manufacturing aspirin and give you a more realistic hypothetical in this case. If you were to say that King Mountain would not be subject to state regulations off the reservation, there is nothing to prohibit King Mountain from going to the state fair and handing out packs of cigarettes and giving them to minors because those restrictions and regulations would not apply because they have this treaty. Where does it end? It ends on the boundaries of the reservation and the state's regulations, whether they consider them economic or public health, if they're for pure regulatory restrictions, those should apply. Counsel, isn't Article 3 a slightly stickier wicket for you? There is this language from Smithskin that is emphasized in the briefing, the right to transport good to market without restriction. Yes, let's talk about Article 3. Smithskin is- I think it can be distinguished. Secondly, they read Smithskin too broadly. Smithskin talked about- well, first let me back up. First of all, Article 3 just says that you have the right, the tribal members have the right to travel along the public highways in common with other citizens. Both legally and factually, that's distinguished here. The tribal members can go on and off the reservation and there is no restriction on them. What Smithskin was talking about is that you have to provide notice to the Liquor Control Board before they could transport their cigarettes. But it was about transporting. And it was about transport. It was about movement. There's no restriction here on transporting. King Mountain can take those cigarettes that they put together on the reservation, haul them off the reservation, go to Yakima, and they can sell those to the Safeway store. There's no regulation that's imposed. But my point really is just- and I don't want to make too much of this, except that Article 3 talks about transportation. And I think I've indicated that that's my read in the questions and I think Judge Grieber has as well, although I don't want to speak for her. But that's how I read it. And yet, Smithskin does talk about trade, the right to transport without restriction to market. I mean, it's a- this is a different shade of gray. There are. There's two responses I have for you. First, let me get to the broad reading. It does say that because it wouldn't make sense to transport without having the ability to do something with that transportation. And that is where the court looked back and said, well, obviously, you've got to have an ability to trade or exchange in your goods. Well, that doesn't mean- I don't think you can read Smithskin to say that that then means that you're not subject to any regulation. So for example- If it did, wouldn't that also defeat Colville? If it did, it would be in conflict with the decisions of- the Supreme Court's decision in Mescalero and Cotton Petroleum. And it wouldn't be right. Because no tax could be levied, right? Not only a tax, but no regulation. And that gives me to the second point that I want to point out to you is that I believe you can distinguish Smithskin in this case because it's transportation. But even if you don't, I think the court can look at and consider that Smithskin is wrongly cited, if that is going to be their interpretation of Smithskin. That you can carte blanche, go off the reservation, and you can trade and be free from any restriction. That's why I think that this court, although cannot overrule Smithskin, this panel- Well, you gave it a good shot in your briefing. I liked the plug there. Thank you. It was interesting. Bold. Anyway, I didn't mean to- But I think, Your Honor, what you can say is that, at a minimum, that King Mountain reads this too broadly. That you can take goods and you can trade those goods off the market, but what you can't do is be free from any regulation or restriction. And that's exactly what this is designed to do, is so that the state doesn't bear the financial burden imposed by cigarette manufacturers selling their product to consumers in the state of Washington. If there's no further questions, I'd ask you to uphold the district court's judgment. I think there are no further questions. Thank you. Thank you. Mr. Barnhouse, you have some rebuttal time remaining. I do have a few seconds, Your Honor. We cannot take these cigarettes to Yakima Settlement the Safeway. That's the problem. The Safeway won't buy them because they're not on the directory list. And the reason the state makes money on that is, it has a contract with these tobacco companies that says if the big tobacco companies lose market share, they reduce their payments to the state of Washington. The state of Washington makes billions of dollars off of this setup, and the only way they can make that money is by making sure King Mountain doesn't take big tobacco's market share through cheaper cigarettes. In Smiskin, the problem wasn't the state wasn't making money. The question was, did he have to call up and say, we're bringing our cigarettes in? There wasn't any money change in hands, but it was the notice because then the state could tax. Here, it's getting on the list so that we can't compete. We can't compete price-wise with the major tobacco. I'm not saying we went on Article 3 at a trial before the district court, or even on the facts necessarily. I think we should. But the problem here is, you don't have those factual findings on the treaty. What is your response to Mr. Hankins' argument that both sides moved for summary judgment and both sides represented to the district court that there were no issues of material fact? There were no issues of material fact because they didn't introduce any material facts. So they accepted our facts. Did you or did you not also move for summary judgment? We did, Your Honor. And in doing so, did you not say to the district court, from your perspective, there were no issues of material fact to be resolved? There were no issues of fact had the court accepted our facts. If the court had accepted our facts without controverting facts from the state, then we would have won. But the court didn't take that next step. It didn't say, the treaty has expressed federal law, so now I have to take the next step and find the facts to see about this treaty with the Acomas. It's a very unique treaty. This right, these two rights, and how does the Acoma see this exclusive use and benefit? As a judge or lawyer, I think it's just geographic, but I have to move beyond that under the precedence of this court and the Supreme Court. Thank you. Thank you very much. We appreciate the arguments that both of you have given today. They've been very interesting and helpful. The case is submitted and we will be adjourned for this morning's session.
judges: NOONAN, GRABER, CHRISTEN